UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| SCHOOL UNION NO. 37, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 8-216-B-W |
| | ) | |
| UNITED NATIONAL INSURANCE CO., | ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDED DECISION**

School Union No. 37 sued its insurer, United National Insurance Company, in a two-count complaint in state court, alleging breach of a contract of insurance and a violation of the Unfair Claims Settlement Practices statute found at 24-A M.R.S. § 2436-A. United National removed the case to this court. The case arises out of United National's refusal to pay SU 37 for the expenses SU 37 incurred in defending an administrative claim under the Individuals with Disabilities Education Act and seeking judicial review in federal court to set aside an award granted by the administrative hearing officer. The parties have filed a stipulation of facts (Doc. No. 16) and cross-motions for summary judgment (Doc. Nos. 17 & 18). The Court referred the cross-motion to me for a recommended decision. I now recommend that the Court deny SU 37's motion and grant United National's motion.

**STIPULATED FACTS**

School Union No. 37 ("SU 37") is the local education agency that encompasses six school administrative units that have joined for the purpose of receiving joint administrative services in Franklin County, Maine. United National Insurance Company ("United National") is a corporation duly organized and existing under the laws of the

Commonwealth of Pennsylvania, with a principal place of business in Bala Cynwyd, Pennsylvania.   At all relevant times, United National possessed a foreign surplus lines license to write, sell and issue liability insurance in the State of Maine.   On or before June 23, 2003, SU 37 purchased a contract of insurance from United National for an Educators Legal Liability Policy (the "Policy").

The material provisions of the Policy are not stated in the parties' stipulation of facts.   Rather, they stipulate that the Policy and other relevant exhibits are attached to the stipulation.   The parties refer to provisions of the exhibits in their memoranda and cite to the stipulated exhibit in support.   Possibly the parties have approached summary judgment in this fashion because the exhibits "speak for themselves."   It is a wholesale violation of Local Rule 56, but I have endured it because in this instance it is a manageable approach to a straight-forward coverage dispute, the material provisions of the Policy are easily drawn from the exhibit, and there are no contentious opposition statements or reply statements to labor over.[1]

The Policy is a "claims made" Educators Legal Liability Policy and was in force at all relevant times.   In particular, the Policy was in force during March through June 2005.   (Stip. ¶¶ 3-4.)   The material insuring agreements, exclusions and definitions are as follows:

EDUCATORS LEGAL LIABILITY POLICY

. . . .

The Insurer does not have any obligation or duty to defend any Insureds.

. . . .

---

[1]  The exhibits in this case (A-N), beginning with the Policy, are identified as Doc. Nos. 16-2 through 16-15.  The documents carry consecutive page numbers in the upper right hand corner identifying them as STIP 00001 – STIP 00091.

I.  INSURING AGREEMENTS

    A.  The Insurer will pay on behalf of the Insureds loss and defense expenses in excess of the stated deductible and up to the stated limit of liability for any claim due to a Wrongful Act to which this policy applies, only if the

        1.  Wrongful Act takes place on or after the *retroactive* date, if any, and before the end of the policy period or any earlier termination date of this policy;

        2.  Claim is first made against the Insureds during the policy period; and

        3.  Claim or circumstance is reported to the Insurer in writing during the policy period, the automatic reporting period, or the optional extended reporting period, if purchased by the Insureds.

    . . . .

II.  EXCLUSIONS

This policy does not apply to any loss or defense expenses for any claim or circumstance:

    A.  based on any Insureds gaining any profit or advantage to which they were not legally entitled;

      . . .

    C.  based on any willful violation of statute, ordinance or law;

      . . .

    F.  seeking other than money damages;

      . . .

III. DEFINITIONS

    A.  CLAIM

    Claim means any written demand for money damages to which this policy applies.

    . . . .

    G. LOSS

    Loss is any amount which the Insureds are legally obligated to pay as damages including back and future pay awards.

3

H.  WRONGFUL ACT

> Wrongful Act means any actual or alleged error, misstatement,
> misleading statement, act, omission, neglect or breach of duty by the
> Educational Entity or any other individual Insureds solely while acting
> within the scope of that person's duties for the Educational Entity.

(Stip Ex. A at Stip. 0004-0007.)  The Policy insured SU 37 to the extent of $1 million

with a $5,000 per claim deductible.  (Stip. Ex. A at 2.)

The parties provide the following stipulations concerning the procedural history

of the underlying dispute for which SU 37 sought coverage:

> 5.  On March 23, 2005, DB and Ms. C filed with the Maine Department of
> Education a Dispute Resolution Request Form seeking to recover non-
> tuition expenses for the years of 2002-03 and 2003-04, totaling
> $24,854.44.  A true copy of the Dispute Resolution Request Form, with
> names of the complainants redacted, is attached [to the stipulated facts] as
> Exhibit B.
>
> 6.  On May 17, 2005, DB and Ms. C dismissed that request.
>
> 7.  On June 30, 2005, Ms. C and DB filed with the Maine Department of
> Education a Dispute Resolution Request Form seeking to recover non-
> tuition expenses for the years 1999-2004.  A true copy of the Dispute
> Resolution Request Form, with names of the complainants redacted, is
> attached [to the stipulated facts] as Exhibit C.
>
> 8.  DB had completed his schooling by the time he and his mother brought
> their claims against SU 37.
>
> . . . .
>
> 16.  Ms. C's and DB's claims against SU 37 proceeded to a hearing before
> a Hearing Officer appointed by the Commissioner of Maine's Department
> of Education.
>
> 17.  On November 14, 2005 the Hearing Officer issued her final decision.
> A true copy of that decision is attached [to the stipulated facts] as Exhibit
> K.
>
> . . . .

19.  In December 2005 SU 37 brought suit in this Court (No. 05-194-B-W) against Ms. C and DB, seeking review and reversal of the Hearing Officer's decision.

20.  On June 20, 2006 the Magistrate Judge issued a decision recommending that judgment be entered for SU 37, and the District Judge affirmed that recommended decision on July 28, 2006.

21.  On August 23, 2006, Ms. C and DB appealed this Court's decision to the U.S. Court of Appeals for the First Circuit.

22.  On February 26, 2008, the Court of Appeals affirmed this Court's decision.  School Union No. 37 v. Ms. C, 518 F.3d 31 (1st Cir. 2008). That decision is final.

23.  In the course of the litigation with Ms. C and DB, SU 37 incurred and paid attorney fees and litigation expenses in the total amount of $73,052.14.

The underlying dispute was commenced with a Dispute Resolution Request Form.  (Stip. Ex. C.)  In that charging document, the parent alleged that the child's school, Dallas Plantation, was responsible for funding the child's education between 1999 and 2004, but failed and refused to pay any non-tuition costs associated with private school placements. The parent sought reimbursement for the non-tuition costs she incurred on the child's behalf and that the school should have funded.  (Stip. Ex. C. at Stip. 00025-00026.) The following characterization of the underlying dispute is drawn from the First Circuit's opinion on the matter:

DB and his mother, Ms. C, filed a request for a due process hearing with the Maine Department of Education after DB turned nineteen and was no longer enrolled in school.  Although all of DB's special education tuition had been paid, he and his mother sought reimbursement for past room and board and transportation expenses associated with DB's education in private schools outside of Maine.  They obtained the relief they were seeking from the Maine special education hearing officer.  School Union No. 37 then filed this action in the district court under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1490 ("IDEA"), to challenge the administrative decision.  The district court entered judgment

5

for the School Union.  Ms. C and DB appeal, arguing that their action was
not barred by the equitable defense of laches.  We affirm.

School Union No. 37 v. Ms. C, 518 F.3d at 32.

When the underlying claim was first unfolding, between June and October of
2005, counsel for SU 37 and Dr. William Richards of the Rangeley School Department,
on the one hand, and Senior Claims Examiner Jeffrey Eckman at United National, on the
other, carried on correspondence in which SU 37 sought coverage from United National
and United National denied the existence of coverage.  (Stip. ¶¶ 9-15.)  Copies of this
correspondence are attached to the stipulated facts at Exhibits C through J.  (Id.)  In
essence, SU 37 maintained that the parent's claim for expenses was predicated on a claim
that SU 37 had wrongfully failed to provide her child with a free and appropriate public
education (FAPE), in violation of the IDEA.  SU 37 further observed that the parent did
not contend that the violation was willful.  (Stip. Ex. D.)  United National denied
coverage based on the following theory expressed in an August 24, 2005, denial of
coverage letter:

> The action brought by the claimant is one seeking reimbursement of costs
> to which you are disputing in an administrative proceeding.  You are not
> disputing the claimants entitlement to all costs associated with her claim
> but are contesting some of these costs.  In order for coverage to apply,
> there must be a wrongful act committed by the Insured.  The Insured, in
> this case, has not committed any actual or alleged error, misleading
> statement, act, omission, neglect or breach of duty.  They are merely
> contesting the amount owed to the claimant.  Your attorney contends that
> some of the costs associated with the outplacement of the claimant's son
> may in fact be recoverable from the school district.  If it is determined that
> some or all of these costs are recoverable, it is the school district that owes
> the plaintiff these costs and not their Insurer.
>
> Any action or actions of action [sic] on the part of United National, its
> agents or representatives does not constitute a waiver of our rights.

(Stip. Ex. G at Stip. 00038.)  Subsequently, United National asserted that the alleged

failure on the part of SU 37 constituted a "willful violation" that "would be excluded

from coverage."  (Id.)  In a later missive sent October 20, 2005, United National stated its

position thusly:

> If FAPE requires the school union to pay these expenditures, you will not
> pay the claimant as a result of an alleged wrongful act.  You cannot rely
> on a policy of insurance to relieve you of your duty to honor any
> obligations you may or may not have under FAPE.  If the statute requires
> that such costs be reimbursed as part of providing FAPE, then the basis of
> the obligation is the statute, and not liability arising out of a wrongful act.
>
> Any action or actions of action [sic] on the part of United National, its
> agents or representatives does not constitute a waiver of our rights.

(Stip. Ex. I.)

On November 14, 2005, the hearing officer tasked with the due process hearing

concluded that the parent was entitled to recover the expenses she sought.  The hearing

officer based this conclusion on the following findings:

> The "policy" of Dallas Plantation[2] was that it would pay the tuition,
> including any costs related to providing special education services to the
> student.  The town would not pay, however, any costs associated with
> room, board, or other expenses.  Dallas Plantation believed it could also
> shift its responsibility for holding PET meetings, and other decisions
> related to special education services, to the private school of choice of the
> parent.
>
> The "policy" developed by Dallas Plantation is a clear violation of federal
> law under IDEA.  A school may not simply give a check to a private
> school and be absolved of its continued obligations under federal and state
> law.  Dallas Plantation had an obligation under IDEA to provide the
> student with a free appropriate public education.  By shifting
> responsibility to the private schools involved in this case, Dallas
> Plantation failed to provide the student with FAPE.

---

[2]      Dallas Plantation is within School Union 37.

(Stip. Ex. K at Stip. 00063.)  Because Dallas Plantation, a unit of SU 37,[3] was determined to have shirked its duty to evaluate whether the parent's placement of the student offered the student an appropriate public education, so long as it was only asked to pay tuition and additional special education costs, the hearing officer concluded that it had failed "to comply with crucial procedural aspects of IDEA relating to the IEP [individualized education program] process" and had "denied the student FAPE."  (Id. at Stip. 00066.) Building on this foundation, the hearing officer determined that, "[g]iven that no program or placement was offered to the student between the school years of 1999-2004, with the exception of the May of 1999 IEP, which offered only [insufficient] consultation services, equity requires that Dallas Plantation reimburse the parent for room and board" and that "equity requires Dallas Plantation to reimburse the parent for six round trips for the student and one round trip for the parent, provided appropriate documentation is provided."  (Id. at Stip. 00069.)  In conclusion, the hearing officer summarized that she was making an equitable award of room and board and transportation expenses because of the school's "failure to conduct regular IEP meetings, draft IEPs, or offer any type of program or appropriate placement to the student[,] a clear abandonment of its duty to the student under IDEA."  (Id. at Stip. 00070.)

On November 21, 2005, counsel for SU 37 provided Mr. Eckman with a copy of the Hearing Officer's final decision.  (Stip. ¶ 18.)  United National never afforded a defense to SU 37.

---

[3]        I substitute SU 37 for Dallas Plantation because the allegedly wrongful act of Dallas Plantation is attributed to SU 37 for purposes of the instant coverage dispute.

**DISCUSSION**

The parties have filed cross-motions for summary judgment. SU 37 maintains that the underlying IDEA dispute alleged a "wrongful act" and constituted a claim for damages that, at the very least, triggered United National's duty to defend. (Pl.'s Mot. at 7, Doc. 17.) It further argues that United National's refusal to pay SU 37's defense costs was an unfair claim settlement practice because there was no reasonable basis to contest coverage. (<u>Id.</u> at 16.) For its part, United National argues that the underlying dispute was not a "claim" within the meaning of the Policy and that SU 37 would not have suffered a "loss" had it not prevailed in federal court. It further contends that the underlying dispute did not arise as a result of a "wrongful act." (Def.'s Mot. at 5-7, Doc. 18.) In United National's view, the underlying dispute can only be colored as a claim for damages because the parent never timely sought injunctive relief in regard to the school's duty to develop the child's IEP, letting the school shirk a statutory mandate and then retroactively seeking equitable reimbursement for a dereliction of statutory obligations. (<u>Id.</u> at 9.) As an insurer, United National objects to the notion that SU 37 should be permitted to pass its affirmative financial burdens to a third party and then, when the third party seeks reimbursement, pass the burden to its insurer. (<u>Id.</u> at 9-10.)

### A. The Coverage Dispute

The Policy plainly provides that the insurer "does not have any obligation or duty to defend" the insured. Rather, the Policy offers "loss and defense expenses" for claims due to wrongful acts. Consequently, this case presents a basic coverage question rather than a duty to defend question.

> A contract of insurance, like any other contract, is to be construed in
> accordance with the intention of the parties, which is to be ascertained

9

when there is ambiguity by examining the whole instrument.  <u>Baybutt</u>
<u>Corp. v. Commercial Union Ins. Co.</u>, 455 A.2d 914, 919 (Me. 1983)
(overruled on other grounds).  A liability insurance policy must be
construed to resolve all ambiguities in favor of coverage.  <u>Massachusetts</u>
<u>Bay Ins. Co. v. Ferraiolo Constr. Co.</u>, 584 A.2d 608, 609 (Me. 1990).

<u>Maine Drilling & Blasting v. Insurance Co. of N. Am.</u>, 665 A.2d 671, 673 (Me. 1995).

I begin with the language of the Policy.  The Policy affords loss and defense

coverage "for any claim due to a Wrongful Act," where "wrongful act" means "any actual

or alleged error, . . . act, omission, neglect or breach of duty by the Educational Entity or

any other individual Insureds solely while acting within the scope of that person's duties

for the Educational Entity," and "claim" means "any written demand for money

damages."

**1.   The underlying charge did involve a wrongful act.**

In terms of the plain meaning of the statute, I fail to understand how the alleged

dereliction of duty by the school would not meet the definition of wrongful act supplied

in the Policy, which includes a "breach of duty."  It is apparent from a review of the

charging instrument that the parent maintained a right to reimbursement on account of a

failure by the school to fulfill a duty attendant to its educational function.

United National has a handful of precedents in its quiver that, in its view, support

a policy that no wrongful act can be found on circumstances such as these.  Most notable

among them is <u>Pacific Insurance Company, Limited v. Eaton Vance Management</u>, 369

F.3d 584 (1st Cir. 2004).  There, the First Circuit determined that the insurer did not owe

any indemnity based on language in the policy requiring that the insured incur "a (1) 'loss

or liability' (2) 'by reason of' (3)" a breach of duty.  <u>Id.</u> at 588-89.  The insured was an

employer, Eaton Vance, with a self-funded ERISA plan.  Eaton Vance failed to fully fund

the plan in accordance with language it had placed in the plan.  Id. at 585-86.  Prior to

any litigation, Eaton Vance realized its oversight and informed participants that it would

fund accounts at the level they should have been funded.  Id. at 586-87.  It established

accounts for 49 participants and contributed $880,869.86 to the accounts.  Id. at 587.  The

insurer sought a declaratory judgment that policy proceeds could not be obtained to

reimburse the employer for the funds it put into these accounts because the employer's

obligation to fund the accounts did not arise "by reason of" a breach of duty.  Id. at 588.

The First Circuit granted this declaratory relief because:

> the relevant liability for which Eaton Vance seeks recovery from its
> insurer is *not* one for breach of fiduciary duty relative to the belatedly
> funded employee accounts;  rather, Eaton Vance seeks reimbursement for
> amounts it paid -- principal and interest -- in satisfaction of its Plan-
> created obligation to establish and fund those accounts to the level they
> would have attained had Eaton Vance initially complied with the Plan.

Id. at 590.  Unlike the situation in Eaton Vance, the situation here does not concern a

request by the insured for indemnification of the insured's voluntary funding of a liability

voluntarily created by the insured.  Moreover, the question in Eaton Vance was whether

the *insured's loss or liability* arose by reason of a breach, id. at 587, whereas here the

Policy is drawn in terms of whether the *third-party's claim* was due to a wrongful act.

In the course of rendering its opinion, the First Circuit quoted the Supreme Court

of Nevada for the following proposition:  "The refusal to pay an obligation simply is not

the cause of the obligation, and the [insured's] wrongful act in this case did not result in

their obligation to pay; [its] contract imposed on [it] the obligation to pay."  Id. (quoting

American Cas. Co. of Reading, Pa. v. Hotel & Rest. Employees & Bartenders int'l Union

Welfare Fund, 942 P.2d 172, 176-77 (Nev. 1997)).[4]  United National relies on this proposition in support of its argument that there was no wrongful act in this case.  (Def.'s Mot. at 9.)  This language does not prove helpful to the instant case, in my view, because a review of the hearing officer's decision makes it clear that, if there was any ground for the parent to obtain equitable relief in the form of reimbursement, it was on account of the school's "wrongful act" of failing to carry out its statutory duty to develop and oversee the child's IEP.  In other words, in this case there is a causal relationship between a wrongful act and a third party's pursuit of a claim, whereas in the cases relied upon by United National, it could not be said that the insured's liability existed because of a wrongful act.  Different policy language called for a different focus.  Although I appreciate United National's ultimate point that SU 37's obligations under the IDEA were not insured liabilities, I reject United National's argument that there was no "wrongful act," as that term is defined in the Policy.  Moreover, the insuring agreement conditions coverage on the presentation of "any claim due to a Wrongful Act," not on proof that the underlying liability or exposure came into existence because of a wrongful act.

## 2.  The underlying charge did not present a claim for money damages.

The question then becomes whether the charging instrument presented a "claim." Given the definition authored by United National, in order to conclude that a claim was

---

[4]      In Hotel & Restaurant Employees the insured had contractually agreed to indemnify a third party for certain liabilities and received valuable consideration to be so bound.  When the third party later sought indemnification under this contractual agreement, the insured tried to make its insurer pick up the tab for liabilities arising from the insured's indemnification agreement with the third party.  942 P.2d at 174-75. The decision that an indemnity was not due from the insurer was expressed in terms that the loss in question did not result from a wrongful act, but from a contractual obligation.  Id. at 176-77.  The court reasoned:  "This contractual obligation did not result from their wrongful act of refusing to satisfy it. To hold otherwise would allow an insured to turn all of its legal liabilities into insured events by the intentional act of refusing to pay them."  Id. at 176.  As in Eaton Vance, the analysis concerned the question of whether the insured's "loss" or "liability" stemmed from a wrongful act, not whether a wrongful act gave rise to a third-party "claim."

not presented, the Court must conclude that the parent's request for reimbursement did

not constitute a claim for "money damages."  The term "money damages" is not defined

in the Policy.  Resort might be made to common dictionary definitions.  However, the

Law Court has previously held that:

> Common dictionary definitions of "damages" are not very helpful.  We
> observe that of the range of definitions collected in other opinions, many
> support a restrictive reading, see e.g., Broadwell Realty Services, 528
> A.2d at 82 ("the word 'damages' generally refers to a pecuniary
> compensation or indemnity . . . and . . . the cost of complying with an
> injunctive decree does not ordinarily fall within this definition"); Boeing
> Co. v. Aetna Cas. & Sur. Co., 784 P.2d at 520-21 (dissenting opinion)
> (surveying 19 dictionaries and finding that they distinguish damages from
> restitution and that use of the term to include costs or expenses is almost
> universally labeled informal, colloquial or slang).

Patrons Oxford Mut. Ins. Co. v. Marois, 573 A.2d 16, 19 n.5 (Me. 1990).  When it

comes to "damages" available in a legal forum and common parlance, in other

words, we are treading on rather uncertain ground.  According to the Law Court,

an ordinary person making resort to a dictionary could well recognize that a

distinction exists between damages and the costs of compliance with injunctions

or a restitution remedy.  Id.  Moreover, the Law Court concluded that it does not

make the term "damages" ambiguous just because a "first time reader" would not

understand the scope of the term.[5]  Id. at 19;  but see City of S. Portland v. Maine

Mun. Ass'n, 2008 ME 128, ¶ 7, 953 A.2d 1128, 1130 (quoting Pelkey v. GE

Capital Assur. Co., 2002 ME 142, ¶ 10, 804 A.2d 385, 387) ("A provision of an

insurance contract 'is ambiguous if . . . any ordinary person in the shoes of the

---

[5]       United National argues that the facts of Marois are analogous.  I disagree because they are easily
distinguished.  Marois involved the question of whether the cost of complying with a state administrative
enforcement order amounted to damages where there was no third-party claim of injury.  Marois, 573 A.2d
at 18-19.  In this case, there was a third party pursuing a monetary award in the underlying dispute.

insured would not understand that the policy did not cover claims such as those brought.'").

The next step is to compare the relief requested in the underlying claim to the language of the Policy.  The parent requested reimbursement under the IDEA for travel and room and board expenses associated with private school placements.  The claim for reimbursement sought an award of money to compensate for money previously spent based on an alleged failure of the school to carry out its obligations under the IDEA.  A layperson turning to a dictionary most likely would have a difficult time articulating why this would not amount to a claim for damages.  However, both the Supreme Court and the First Circuit Court of Appeals have held, albeit outside of the context of a coverage dispute, that a claim for reimbursement under the IDEA does not present a claim for damages.

In School Committee of Burlington v. Department of Education, the Supreme Court considered whether the potential relief available under § 1415 of the IDEA (at that time called the Education of the Handicapped Act) "includes reimbursement to parents for private school tuition and related expenses."  471 U.S. 359, 367 (1985).  The Court held that it does and that such a remedy effectively substitutes for "a prospective injunction directing the school officials to develop and implement at public expense an IEP placing the child in a private school."  Id. at 370.  This remedy is appropriate, the Court reasoned, because the judicial review process is too slow, in general, to provide prospective injunctive relief in all cases, and a reimbursement award is necessary to protect parents who appropriately make a private placement when the school has failed to offer an appropriate individualized education program for the child.  After all, "it would

14

be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials." Id.  This remedy the Court labeled "retroactive reimbursement."  Id.  This is the remedy sought by the parent herein.  In characterizing the nature of the remedy the Court rejected a contention that it constituted an award of "damages."  Id.  Rather, the Court held: "Reimbursement merely requires the Town to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP." Id. at 370-71.  The First Circuit has subsequently stated what was implicit in the Supreme Court's characterization of the "retroactive reimbursement" remedy:  that there is no damages remedy under the IDEA.  Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 124 (1st Cir. 2003) (holding that "tort-like money damages, as opposed to compensatory equitable relief, are not available under IDEA").

United National argues that the School Committee decision "teaches that there is a clear distinction between the concept of damages as payment to compensate for loss or injury, and the concept of reimbursement as repayment to another for an obligation that is owed in the first place."  (Def.'s Mot. at 6.)  SU 37 responds that the distinction drawn by the Supreme Court in School Committee does not offer a clear distinction for purposes of the common and ordinary meaning that applies to the language used in insurance policies. It cites a decision of the Appellate Court of Illinois which rejected such reliance on School Committee of Burlington when it comes to determining a state law insurance coverage question.  (Pl.'s Opposition Mem. at 3.)  In General Star Indemnity Company v. Lake Bluff School District No. 65, the Appellate Court of Illinois found that School Committee was "of limited persuasive value" because the Supreme Court "did not define

15

'damages' within the context of insurance policies." 819 N.E.2d 784, 793 (Ill. App. Ct. 2004). Looking to the policy at issue, which, like the instant one, imposed a duty to defend a claim seeking damages arising from a wrongful act, where the term damages was undefined, the Appellate Court concluded that a claim for reimbursement under the IDEA for the costs of doctors' and clinicians' services was a claim for damages under the ordinary and popular meaning of the term damages. Id. at 787, 793-94. The point of the Lake Bluff opinion is that when the term damages is left undefined in an insurance contract, then state common law "accords 'damages' a broad, nontechnical meaning that is not limited to compensatory damages and can include equitable relief." Ace Am. Ins. Co. v. RC2 Corp., 568 F. Supp. 2d 946, 955 (N.D. Ill. 2008) (discussing Lake Bluff). I conclude that the Lake Bluff perspective does not necessarily carry the day when it comes to applying Maine law. I reach this conclusion precisely because the Maine Law Court, as reflected in Marois, has been much less indulgent in its approach to fixing the plain meaning of the term damages, refusing to characterize it as ambiguous and looking to legal opinions respecting the nature of the underlying claim in order to see if it may properly be characterized as claims seeking damages. In that context, I conclude that the Law Court would likely look to the Supreme Court's School Committee opinion and the First Circuit's Nieves-Marquez opinion to inform the coverage determination. Those cases reflect that an equitable award of retroactive reimbursement under the IDEA is not an award of damages. It does not seem to me that Maine law would use the term "damages" to describe a school district's statutory obligation to provide a free appropriate public education to a child. If the policy term "damages" was inclusive of the monetary cost to the school district when it defaulted on its obligation to provide an IEP with

16

appropriate services, left it for the parent to pay for those services, and then turned to its insurer when asked for reimbursement by the parent through the administrative process, the nature of the insuring obligation would have to be entirely different than the one underlying the current policy.

### 3.  Exclusions

SU 37 argues in its motion for summary judgment that none of the Policy's exclusions apply in this case.  In its motion for summary judgment United National does not contend that summary judgment should enter in its favor on any of the exclusions. Nor does United National, in its opposition to SU 37's motion for summary judgment, present any arguments in favor of any exclusion.  I conclude that the cross-motions do not require any disposition with respect to policy exclusions.  Should the Court accept the present recommendation, there will be no need to reach the exclusions because I have recommended that the underlying dispute is not covered by the insuring agreements.  On the other hand, should the Court reject this recommendation and determine that the IDEA remedy is a claim for money damages, it would not need to reach the exclusions because United National has not advanced any of the exclusions in support of its motion or in opposition to SU 37's motion.

### 4.  Waiver of defenses

SU 37 argues that United National has waived all defenses to coverage that were not expressed by United National in Mr. Eckman's denial of claim letters.  (Pl.'s Mot. at 11-12.)  Among these allegedly waived defenses SU 37 includes the affirmative defense that there is no "claim" as that term is defined in the Policy.  (Id. at 11.)  SU 37 bases its waiver contention on 24-A M.R.S.A. § 2436-A(1)(D), a subsection of the unfair claims

settlement practices provision of the Maine Insurance Code.  That subsection entitles an insured to bring a civil action if injured by the insurer's failure to affirm or deny coverage, or to reserve an appropriate defense, within a reasonable time following investigation.  Id.  United National disputes the contention that this provision can be construed to effectuate a waiver.  (Def.'s Opposition at 3-6.)  The plain language of the provision undermines SU 37's position.  The provision authorizes an insured to bring a civil action under certain circumstances.  It does not announce any new law of waiver.  Beyond this argument, SU 37 has simply not briefed the issue of waiver (or estoppels) other than to cite Vermont common law (Pl.'s Mot. at 12), which is inapplicable here.

## B.  The Unfair Claims Settlement Practices Claim

SU 37's second count seeks damages, costs, interest and attorney fees for an alleged unfair claim settlement practice.  Specifically, SU 37 argues in its motion for summary judgment that United National violated 24-A M.R.S.A. § 2436-A(1)(E), by refusing to pay SU 37's defense expenses.  (Pl.'s Mot. at 16.)  That subsection authorizes the Court to grant the requested remedies based on a finding that United National "[w]ithout just cause, fail[ed] to effectuate prompt, fair and equitable settlement of claims submitted in which liability ha[d] become reasonably clear."  Id.  Based on my legal conclusion that the Policy did not afford coverage for the underlying dispute, I conclude that summary judgment should enter for United National on the unfair claims settlement practices count.  "The unfair claims practices statute sets forth four separate bases for an award of statutory interest and attorney fees, and the failure by the plaintiffs to allege and prove a specific violation precludes recovery under the statute."  Marquis v. Farm Family Mut. Ins. Co., 628 A.2d 644, 651-52 (Me. 1993).  Liability for SU 37's defense of this

particular underlying dispute was not reasonably clear given the nature of the remedy

requested by the parent, which was not a damages remedy.


## CONCLUSION

For the reasons set forth above, I RECOMMEND that the Court DENY Plaintiff's

Motion for Summary Judgment (Doc. 17) and GRANT Defendant's Motion for Summary

Judgment (Doc. 18.)


### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

March 6, 2009